```
 1                  IN THE UNITED STATES DISTRICT COURT
                   FOR THE EASTERN DISTRICT OF VIRGINIA
 2                           Newport News Division

 3

 4    - - - - - - - - - - - - - - - -
      UNITED STATES OF AMERICA,        )
 5                                     )
           V.                          )
 6                                     )   CRIMINAL NO. 4:24-CR-49
      JAMAL ASHTON SHIELDS,            )
 7                                     )
                   Defendant.          )
 8    - - - - - - - - - - - - - - - -  )

 9

10

11                PARTIAL TRANSCRIPT OF PROCEEDINGS

12                       Witness Testimony

13                     Newport News, Virginia

14                       February 4, 2025

15

16    BEFORE:    THE HONORABLE ARENDA L. WRIGHT ALLEN,
                 United States District Judge
17

18

19    APPEARANCES:

20               UNITED STATES ATTORNEY'S OFFICE
                 By:  D. Mack Coleman
21                    Therese O'Brien
                      Counsel for the United States
22

23               OFFICE OF THE FEDERAL PUBLIC DEFENDER
                 By:  Keith Loren Kimball
24                    Sean Carlton Mitchell
                      Counsel for Defendant Jamal Ashton Shields
25
```

MICHELLE M. MAAR, Official Court Reporter

```
1                          I N D E X

2    GOVERNMENT'S WITNESSES:                             PAGE

3    MARYDITH NEWMAN
             Direct Examination by Mr. Coleman          3
4            Cross-Examination by Mr. Mitchell          26

5
     KEITH MOORE
6            Direct Examination by Mr. Coleman          30
             Cross-Examination by Mr. Mitchell          50
7            Redirect Examination by Mr. Coleman        53
             Recross-Examination by Mr. Mitchell        54
8

9    JOHN GALBREATH
             Direct Examination by Ms. O'Brien          55
10           Cross-Examination by Mr. Mitchell          71

11

12   GOVERNMENT'S EXHIBITS ADMITTED:

13   Exhibit 1                                          6
     Exhibit 13                                         6
14   Exhibit 18                                         6
     Exhibit 2                                          9
15   Exhibit 3                                          10
     Exhibit 7                                          18
16   Exhibit 38-A                                       20
     Exhibit 5                                          37
17   Exhibit 29                                         37
     Exhibit 6                                          38
18   Exhibit 6-A                                        38
     Exhibit 8                                          38
19   Exhibit 8-A                                        38
     Exhibit 20                                         38
20   Exhibit 28                                         38
     Exhibit 30                                         38
21   Exhibit 31                                         38
     Exhibit 9                                          43
22   Exhibit 35                                         49
     Exhibit 10 thru 12-A                               65
23   Exhibit 14                                         70
     Exhibit 15                                         70
24   Exhibit 16                                         70

25
```

MICHELLE M. MAAR, Official Court Reporter

M. Newman -- Direct Examination by Mr. Coleman

```
1              (The witness testimony commences at 3:31 p.m.)
2              THE COURT:  All right.  And then, Mr. Coleman, who
3    is your first witness going to be?
4              MR. COLEMAN:  Your Honor, the United States calls
5    Inspector Marydith Newman.
6              THE COURT:  All right.
7              MARYDITH NEWMAN, called by the Government, having
8    been first duly sworn or affirmed, is examined and testifies
9    as follows:
10                      DIRECT EXAMINATION
11   BY MR. COLEMAN:
12   Q.  Good afternoon, ma'am.  Will you please tell us your name
13   and spell it for the court reporter.
14   A.  Sure.  My name is Marydith Newman, M-A-R-Y-D-I-T-H,
15   N-E-W-M-A-N.
16   Q.  How are you employed?
17   A.  I'm a Postal Inspector with the United States Postal
18   Inspection Service.
19   Q.  Just briefly, what is a postal inspector?
20   A.  A postal inspector is the law enforcement agency, we're
21   the law enforcement agency for the postal service.  And we
22   investigate various crimes, such as mail theft, violent
23   crimes against our employees, narcotics through the U.S.
24   Mail, mail fraud, things along those lines.
25   Q.  And how long have you been a postal inspector?
```

M. Newman -- Direct Examination by Mr. Coleman

```
1    A.   Twenty-two years.

2    Q.   And what is your current job for the Postal Inspection

3    Service?

4    A.   Currently, I'm the Acting Program Manager for Revenue

5    Investigations, but I've only been in that capacity for a

6    couple months.  Prior to that, I was the team leader for the

7    Postal Inspection Service for the Richmond and Norfolk

8    domiciles.

9    Q.   What was your position in the summer of 2024?

10   A.   I was the team leader for the Norfolk Office.

11   Q.   And in your capacity as a team leader, did you cover more

12   than just the Norfolk area?

13   A.   Yes.  We're one of the smaller federal law enforcement

14   agencies.  So I sit in Richmond, Virginia.  And I supervise a

15   portion of our programs in Richmond and all of southern

16   Virginia.  And that would include also our Norfolk Office.

17   Q.   Does that also include Newport News?

18   A.   Yes.

19   Q.   Was your team focused on any particular program areas for

20   the Postal Inspection Service?

21   A.   Yes.  So there had been an uptick of armed robberies of

22   letter carriers in the Middle Peninsula and the southern part

23   of the state, in Norfolk, which had basically led -- these

24   robberies were for what is called postal Arrow Keys.  And

25   this had led to an uptick of mail theft through the Middle
```

M. Newman -- Direct Examination by Mr. Coleman

1    Peninsula and Norfolk areas of Virginia.  And so my team was

2    very focused on the robberies and then the subsequent mail

3    theft.

4    Q.  Okay.  So did there come an occasion last year, in 2024,

5    when your team conducted an operation in Newport News?

6    A.  Yes.

7    Q.  And when was that approximately?

8    A.  I believe that would be July 21st through July 22nd.

9    Q.  And where was this operation?  Where did it take place?

10   A.  We were focused on the Patrick Henry Post Office.

11           MR. COLEMAN:  And, Your Honor, we have a

12   stipulation, it's Stipulation Number 7.  May I read that into

13   evidence at this time?

14           THE COURT:  You may.

15           MR. COLEMAN:  Just a moment.

16           (Brief pause in the proceedings)

17           MR. COLEMAN:  So, ladies and gentlemen, Stipulation

18   7 says that United States Exhibits 1, 13, and 18 consist of

19   maps and aerial views of areas comprising or surrounding the

20   stated location on or associated with particular exhibits.

21   The parties agree that the maps and the aerial views

22   accurately depict the areas shown and may be admitted without

23   further evidentiary foundation.

24           With that, Your Honor, the United States would move

25   to admit Government's Exhibits Number 1, 13, and 18 -- the

M. Newman -- Direct Examination by Mr. Coleman

```
1    maps referenced in Stipulation Number 7.
2            THE COURT:  They will be admitted.
3            (Government's Exhibits 1, 13, and 18 are admitted.)
4            MR. COLEMAN:  Your Honor, may I publish
5    Government's Exhibit 1, which was just admitted?
6            THE COURT:  You may.
7    BY MR. COLEMAN:
8    Q.  Do you recognize this location, Inspector?
9    A.  Yes.
10   Q.  What is it?
11   A.  This is a map of the Patrick Henry Post Office and the
12   surrounding roads and area.
13   Q.  And it looks as if there's an address there with a red
14   icon.  What is that location?
15   A.  That's the post office itself.
16   Q.  What address is that?
17   A.  It's 685 Turnberry Boulevard.
18   Q.  And I think we're having some technology issues --
19   normally you would be able to make a mark on the screen.
20           But can you describe the roads here, which roads are
21   which, and where this is in Newport News?
22   A.  Well, the road -- I guess the road running kind of east
23   to west would be Turnberry.
24   Q.  Let me stop you there.  Just to clarify -- so the road --
25   that 685 Turnberry Boulevard -- it looks like in front of the
```

M. Newman -- Direct Examination by Mr. Coleman

1    post office there's a little U-shaped driveway?

2    A.   Correct.

3    Q.   Is that a street?  Or is that just part of the postal

4    complex?

5    A.   That's part of the postal complex.  That's like an access

6    road that you can drive in to access the blue collection box.

7    Q.   So there's both an entrance and an exit I think we can

8    see there on Government's Exhibit 1.  What road is that that

9    the entrance and exit connect to?

10   A.   That's Turnberry.

11   Q.   Okay.  And then it looks like -- if I look to the left,

12   there's an intersection at the bottom left of the screen with

13   a road running diagonally.  What is that diagonal road at the

14   bottom left of the screen?

15   A.   I believe that would be Jefferson Avenue.

16   Q.   Okay.  And then on the -- if you go to the right of 685

17   Turnberry, there's another road running diagonally that you

18   first come to.  Do you know which road that is?

19   A.   That's Patrick Henry.

20   Q.   And I think at some point you described this particular

21   post office with its anecdotal name.  What was that?

22   A.   We refer to it as Patrick Henry Post Office.

23   Q.   Why is that?

24   A.   That's what the postal service has named it, the Patrick

25   Henry Post Office.

M. Newman -- Direct Examination by Mr. Coleman

1   Q.  And it's in the vicinity of Patrick Henry, the road?

2   A.  Correct.

3   Q.  Was there a postal collection box at this location?

4   A.  Yes.

5   Q.  And what is a collection box?

6   A.  So it's the blue collection box that is familiar to the

7   public -- it has an eagle on the side, and you see them in

8   front of post offices and throughout the community.

9   Q.  And just to make sure everyone is on the same page, why

10  would -- what happens when you put something in that box?

11  A.  So it's supposed to be a secure receptacle for First

12  Class U.S. Mail.  And people put their mail in the box.  And

13  at certain times of the day, Collections comes through and

14  collects the mail from that box, and that is entered into the

15  mail stream.

16  Q.  And if you address the mail, then the -- I take it the

17  post office takes possession of that and delivers it to where

18  you --

19  A.  Right.  It has an address on it, and it would go to the

20  end user address.

21  Q.  And so the collection box is an authorized repository for

22  the mail, correct?

23  A.  Absolutely.

24  Q.  Okay.  I'd like to show you -- well, I think there's a

25  binder of exhibits there.  In the binder, will you flip to

M. Newman -- Direct Examination by Mr. Coleman

1    Government's Exhibit 2.

2            Do you recognize this image?

3    A.  Yes.  This is the collection box at Patrick Henry Post

4    Office.

5    Q.  And is that a fair and accurate depiction of that

6    location?

7    A.  Yes.  It is.

8            MR. COLEMAN:  Your Honor, at this time, we would

9    move to admit Government's Exhibit 2.

10           THE COURT:  It will be admitted.

11           (Government's Exhibit 2 is admitted.)

12           MR. COLEMAN:  May we publish this to the jury?

13           THE COURT:  You may.

14   BY MR. COLEMAN:

15   Q.  And can you orient us to what this drive that is sort of

16   running adjacent to the blue box vis-à-vis the post office as

17   we just saw on the map?

18   A.  This is the access road that allows people to drive up

19   and deposit mail into the blue collection box.

20   Q.  In this image, in Government's Exhibit 2, there's a car

21   turning right on the road out there.  What road is that?

22   A.  That would be Turnberry.

23   Q.  So if someone were coming to mail a letter, where would

24   they typically park in this location?

25   A.  They would pull in -- it's one way, right.  The driver

M. Newman -- Direct Examination by Mr. Coleman

1    would be depositing the mail out the driver's side window.

2    So you pull in, you come through, deposit your mail, and turn

3    back out onto Turnberry.

4    Q.   I would like to show you in -- will you flip to

5    Government's Exhibit 3 in the binder.

6             Do you recognize that image?

7    A.   I do.

8    Q.   What is it?

9    A.   So this is the road that is in front of that access road

10   that's -- so this would be Turnberry.  In front of that

11   little access road, there's a wooded area.

12   Q.   And is that a fair and accurate depiction of Turnberry

13   Road just outside of the Patrick Henry Post Office?

14   A.   Yes.  That's the sidewalk that runs in front of that

15   area.

16             MR. COLEMAN:  Your Honor, we would move to admit

17   Government's Exhibit 3.

18             THE COURT:  It will be admitted.  And you can

19   publish it.

20             (Government's Exhibit 3 is admitted.)

21   BY MR. COLEMAN:

22   Q.   Let's turn back to this operation that we briefly

23   mentioned before.  You said it started on July 21, 2024.

24   What time did you all start that evening approximately?

25   A.   We had a briefing around 9:30, 10:00 o'clock in the

M. Newman -- Direct Examination by Mr. Coleman

1    evening.  And then we set up at various areas for

2    surveillance around the post office about 10:00, 10:15-ish.

3    Q.  And who was involved in this operation, which agencies?

4    A.  It's the Postal Inspection Service, my inspectors.  It

5    was also Newport News Police and also members from the

6    Virginia State Police.

7    Q.  And approximately how many law enforcement officers total

8    were involved in the operation that day?

9    A.  I would say 10 to 12.

10   Q.  And what was everyone's role, in broad terms, during this

11   particular operation?

12   A.  So this is kind of an interesting area.  So I know myself

13   and Inspector John Kramer were set up a little bit further up

14   the road.  Newport News Police were set up along the road at

15   one point.  And the Virginia State Police were set up along

16   the road at another point.  And Inspector Moore was actually

17   sitting in the post office observing the collection box.  And

18   we were running surveillance throughout the evening of that

19   area.

20   Q.  How were you all communicating with each other if you

21   were in different locations?

22   A.  We had radio communications that we were monitoring and

23   using.

24   Q.  What was the plan for Inspector Moore's role vis-à-vis

25   everyone else?

M. Newman -- Direct Examination by Mr. Coleman

1   A.  So Inspector Moore had what we refer to as an eyeball on

2   the box, right.  He had his eye on the box.  And if he saw

3   somebody accessing the box, an unauthorized individual

4   accessing the box, he was to radio out to the rest of us.

5   And then we were to converge upon that area and attempt to

6   apprehend the suspects.

7   Q.  And are you and the other officers, law enforcement

8   officers involved that evening in marked police vehicles?

9   A.  No.  We don't have -- the Inspection Service does not

10  have marked vehicles.  But I don't believe anybody else had a

11  marked vehicle that night.

12  Q.  And why was it significant for the operation that no one

13  use a marked vehicle?

14  A.  It was covert surveillance.  We do not want an overt law

15  enforcement presence -- as we were trying to catch the

16  individuals accessing that box.

17  Q.  Some of the vehicles that were involved, were they

18  equipped with lights and sirens?

19  A.  Yes.

20  Q.  What clothing, if any, were the members of your team

21  wearing and the members of Virginia State Police and then

22  Newport News Police?

23  A.  We were in plain clothes.  However, all of us were

24  wearing our bulletproof vests, which had police markings.

25  Ours say "Federal Agent Police Postal Inspector" on them.

M. Newman -- Direct Examination by Mr. Coleman

1  Q.  In anticipation of the operation, did you and your team

2  use any technology in aid of that?

3  A.  Sure.  You mean -- I'm sorry, can you repeat?  What do

4  you mean?

5  Q.  During the operation, did you and your team use any

6  technology in aid of the undercover surveillance operation?

7  A.  Sure.  We had what was called a box sensor on the box,

8  which has like a silent alarm.  So if someone accesses the

9  boxes, it sends us like a ping, letting us know that the box

10 had been accessed and the door opens.

11         We also had a camera system over that drive that

12 senses when vehicles drive through that access road.  And it

13 captures the vehicle and the access road.

14         And we also had deployed a GPS tracker system within

15 the box in case whoever took the mail we were not able to

16 apprehend, to be able to track that individual.

17 Q.  Why did you choose to do the operation at this particular

18 post office that evening?

19 A.  We had received various complaints of individuals who had

20 deposited financial instruments, checks, right, into the

21 collection box that never met their end destination, that had

22 been stolen and modified and cashed by others.  When we start

23 to get that sort of complaint, we start focusing on a certain

24 box.

25         In talking to the collectors, who also collect at

M. Newman -- Direct Examination by Mr. Coleman

1    the location, the volume for that box was unusually low,

2    which indicated to us that somebody may be accessing the box.

3    Therefore, we had set up the camera system in, the box sensor

4    a few weeks earlier.  And we had a trend of every Sunday

5    night into Monday morning for a few weeks that somebody had

6    been accessing that box.

7    Q.  Why is a Sunday evening any different than any other

8    night of the week for the post office?

9    A.  So the way the post office works is collections happen

10   every evening 7:00 to 8:00 p.m. during the week and on

11   Saturdays.  So if you drop something in a blue collection

12   box, it will be picked up in the evening by a collector.

13         The post office is not open on Sundays for normal

14   business.  There is no collection on Sundays.  So you tend to

15   get a higher volume of mail left within the box Sunday into

16   Monday morning.  The next collection after Saturday night

17   isn't until Monday evening.  And we see a higher trend of

18   theft on Sunday into Monday morning because of the volume in

19   the boxes.

20   Q.  And how does someone, if they're going to steal mail out

21   of a blue collection box, how do they do that?  How do they

22   get it open?

23   A.  There's a few different methods.  There's what's called

24   the pry method, where someone uses a crowbar to access a

25   collection box; or they can use what is referred to a postal

M. Newman -- Direct Examination by Mr. Coleman

1    Arrow Key, which is a postal service specific key.

2    Q.  Is that the key you mentioned earlier that you all had

3    had issues with because of the robberies you talked about?

4    A.  Yes.  It's a much more -- people prefer to have the Arrow

5    Key because, unless we have some sort of sense someone has

6    been there, lots of times we don't even know that people are

7    accessing the box.  With the Arrow Key, there's no pry marks,

8    there's no damage to the box.

9    Q.  In the early morning hours of July 22nd of last year, did

10   something happen during your surveillance operation?

11   A.  Yes.

12   Q.  What was that?

13   A.  Around 2:00 a.m., someone accessed the box.

14   Q.  How do you know that?

15   A.  Keith, Inspector Moore, excuse me, radioed out that

16   someone had accessed the box -- obviously, it being 2:00 in

17   the morning, someone was keying into the box.  And we

18   converged onto that site.

19   Q.  What was your role at that point in that operation?

20   A.  My role, since I was up the road and could not see the

21   box, was to come into that drive and try to block in whoever

22   was there accessing the box.

23   Q.  And when you arrived at this location pictured in

24   Government's Exhibit 3, what did you see?

25   A.  When we came up the road, we pulled into that access road

MICHELLE M. MAAR, Official Court Reporter

M. Newman -- Direct Examination by Mr. Coleman

1   going the wrong way.  So we pulled in going the wrong way.  I

2   was not driving, Inspector Kramer was.  I was in the

3   passenger seat.  And there was an individual wearing black

4   clothing, he was fleeing from the box, ran in front of my

5   vehicle and into the woods.

6   Q.  And did you pursue that person?

7   A.  We jumped out of the vehicle to pursue that individual.

8           There was somebody in custody who was handcuffed and

9   on the ground at that time.  And the second individual had

10  fled down the street and was pursued not by me but by other

11  law enforcement officers.

12  Q.  Who was the person that was already in custody in the

13  vicinity of this area?

14  A.  Mr. Jumbo.

15  Q.  And did you also see a vehicle in the vicinity of the

16  Patrick Henry Post Office at that time?

17          MR. MITCHELL:  Objection, Your Honor.  Leading.

18          MR. COLEMAN:  I'm happy to rephrase if the Court

19  would prefer.

20          THE COURT:  That's fine.

21  BY MR. COLEMAN:

22  Q.  What did you see in the area depicted in Government's

23  Exhibit 3 when you approached the post office?

24  A.  I just saw that there were vehicles converging, our law

25  enforcement vehicles fleeing the area.  And, like I said, we

M. Newman -- Direct Examination by Mr. Coleman

 1   pulled in that road, and I just saw somebody run in front of

 2   my vehicle, and I jumped out.  And Mr. Jumbo had been

 3   detained at that point on the sidewalk.

 4   Q.  Did you find any items of evidence that evening?

 5   A.  Yes.

 6   Q.  What did you find?

 7   A.  After Mr. Jumbo was handcuffed, myself and another

 8   officer went through the woods.  We had been told that the --

 9        MR. MITCHELL:  Objection to anything they were

10   told.  That's hearsay, Your Honor.

11        THE COURT:  I didn't hear the question.  What was

12   your question?

13        MR. COLEMAN:  I asked did she locate any evidence

14   that evening, Your Honor.

15        THE COURT:  And then what is your objection, Mr.

16   Mitchell?

17        MR. MITCHELL:  Hearsay -- it sounded like she was

18   about to recount something that someone told her.

19        THE COURT:  Are you getting ready to testify to

20   hearsay, what someone else told you?  Or are you getting

21   ready to say what you saw?

22        THE WITNESS:  I can change -- I can rephrase my

23   response.

24        THE COURT:  Okay.  Let's do that.  Only testify to

25   what you saw, what you said.

M. Newman -- Direct Examination by Mr. Coleman

1          THE WITNESS:  Myself and another officer went
2     through the woods, trying to look for anything that may have
3     been dropped or evidence along the way.
4          We came through the woods.  There's another
5     business next to these woods by the post office.  And on the
6     ground, I found a black sweatshirt.  In the black sweatshirt
7     was an Arrow Key.
8     BY MR. COLEMAN:
9     Q.  And I'm going to show you -- actually, could you flip to
10    Government's Exhibit 7 in that notebook please.
11         Do you recognize this picture?
12    A.  I do.
13    Q.  What is it?
14    A.  When I went behind the business, there was a black
15    sweatshirt laying on the ground.  I took this photo.  And
16    when I picked the sweatshirt up, I had gloves on, it was
17    heavy, and there was a postal Arrow Key in the pocket.
18    Q.  Is this a true and accurate depiction of the sweatshirt
19    as you found it?
20    A.  Yes.  I took a picture before I touched it.
21         MR. COLEMAN:  Your Honor, we would move to admit
22    Government's Exhibit 7.
23         THE COURT:  It's admitted.  And it can be
24    published.
25         (Government's Exhibit 7 is admitted.)

M. Newman -- Direct Examination by Mr. Coleman

1  BY MR. COLEMAN:

2  Q.  You mentioned that you found a piece of evidence in that

3  sweatshirt.  Can you explain to the members of the jury where

4  that was located and what you see in this image here?

5  A.  Sure.  The sweatshirt was behind the business next door

6  to the post office.  And in the pocket was the postal Arrow

7  Key.

8  Q.  Can you see that in this particular image?

9  A.  Yeah, there's a little -- you can kind of see a little

10  bit of it right there, that silver key portion with the gold

11  chain.

12  Q.  And what did you do after you located this piece of

13  evidence?

14  A.  I asked someone to bring me an evidence bag.  And this

15  was placed into one of our evidence bags.

16  Q.  And what kind of key did you find in the pocket there?

17  A.  It's a postal Arrow Key that is keyed for Newport News.

18  Q.  Just so I understand -- how do these keys work?  Are they

19  specific to a box or more broad?

20  A.  They're more broad.  For instance, for Newport News, the

21  same key series opens Newport News.  But that key series is

22  different from Hampton.  The same -- one key will not open a

23  box within a 50-mile radius, typically, of an area.  So

24  Newport News is keyed different than Hampton that is keyed

25  different from Williamsburg, from Richmond city.

M. Newman -- Direct Examination by Mr. Coleman

1   Q.  How many total suspects were there in the early morning

2   hours of the operation?

3   A.  Three.

4   Q.  And what came of each of them that evening?

5   A.  One individual fled across the street and carjacked a

6   citizen.  He then fled the area.  So we had secondary and

7   tertiary crime scenes.  The third suspect fled in a vehicle.

8   And Mr. Jumbo was detained by police at that site.

9          MR. COLEMAN:  Your Honor, I would like to read

10  Stipulation Number 11 at this time.

11          THE COURT:  Yes.  That's fine.

12          MR. COLEMAN:  Ladies and gentlemen, United States

13  Exhibit 38 and 38-A consist of a video excerpt obtained from

14  the Newport News traffic camera located on Turnberry

15  Boulevard, in Newport News, Virginia, facing the Patrick

16  Henry Post Office.  The parties agree that the video

17  excerpts comprising these exhibits are authentic and

18  accurately depict the information contained therein and may

19  be introduced and admitted without further evidentiary

20  foundation.

21          Your Honor, at this time, the United States would

22  move to admit Government's Exhibit 38-A.

23          THE COURT:  It will be admitted.

24          (Government's Exhibit 38-A is admitted.)

25          MR. COLEMAN:  May we publish that as well?

M. Newman -- Direct Examination by Mr. Coleman

1          THE COURT:  And it may be published.

2              (The video is played in open court.)

3              MR. COLEMAN:  And we had some technical difficulty

4     there.  I'm going to back this up if it's okay with the

5     Court.

6          THE COURT:  It is.

7              (Brief pause in the proceedings)

8              (The video is played in open court.)

9     BY MR. COLEMAN:

10    Q.  All right.  So where is this particular camera in

11    relation to the post office as you described the area so far?

12    A.  It's facing the exit of the access road on Turnberry for

13    the post office.

14    Q.  So to orient the members of the jury, what road is behind

15    the camera?

16    A.  Behind the camera would be Patrick Henry.

17    Q.  And what road is at the end of the street as we can see

18    it in this particular video?

19    A.  That would be Jefferson Avenue.

20    Q.  And right as the video started, what did you see on the

21    screen coming towards the camera?

22    A.  A vehicle.

23    Q.  Okay.

24              (Brief pause in the proceedings)

25              (The video is played in open court.)

M. Newman -- Direct Examination by Mr. Coleman

1    BY MR. COLEMAN:

2    Q.  While we're waiting -- it looks like there's a light here

3    that looks blueish on that access road.  What is that area

4    right there?

5    A.  That right there is the sign for the post office.  That

6    would be the exit for the access road where the blue

7    collection box is.

8    Q.  What do we see happening now?

9    A.  There's a vehicle pulling up to the wooded area in front

10   of that access road where the collection box is located.

11   Q.  How many people just got out of the vehicle?

12   A.  Two.

13   Q.  What happened to the lights on the vehicle?

14   A.  The lights were turned off.

15          (The video is played in open court.)

16   BY MR. COLEMAN:

17   Q.  How far is the postal collection box from that sign that

18   we just saw?

19   A.  It's right on the other side.  So the road just loops

20   right around, and the collection box is right there on the

21   curb.

22   Q.  Approximately how far do you think it looks?

23   A.  I honestly can't estimate that -- I apologize.  It's

24   right on the other side though.

25   Q.  What did the vehicle just do?

MICHELLE M. MAAR, Official Court Reporter

M. Newman -- Direct Examination by Mr. Coleman

1  A.  It just turned its lights back on.

2  Q.  What is coming down the road in the direction of the post

3  office?

4  A.  Another vehicle.  That vehicle pulling up is my vehicle.

5  Q.  I'll pause it just momentarily.  When you say that

6  vehicle pulling up, which vehicle are you referring to?

7  A.  The SUV.

8  Q.  Coming from which direction?

9  A.  It's coming from Patrick Henry.

10  Q.  And then --

11  A.  At least I'm riding in the vehicle.  I should state that

12  I'm not driving the vehicle.  I'm on the passenger side

13  looking towards the road -- because we knew there were

14  individuals in the collection box.

15  Q.  What did the vehicle that was already there just do?

16      I'll play it again.

17  A.  It looks like he's pulling away -- but it's paused.

18  Q.  Have any of the law enforcement officers activated their

19  lights at this time?

20  A.  Yes.

21  Q.  Do you know which law enforcement vehicle just activated

22  its lights?

23  A.  The minivan that is pulling into the turnoff is driven by

24  Inspector Kevin Horne.  I do not know the vehicle that's

25  closer to the suspect vehicle.

M. Newman -- Direct Examination by Mr. Coleman

1    Q.   Do you see -- what's occurring on the sidewalk area in

2    the vicinity of the post office?

3    A.   So two individuals just ran from the treeline back onto

4    the sidewalk, and the vehicle pulls away that they had exited

5    earlier.

6    Q.   Then on the sidewalk, what is occurring now?

7    A.   Mr. Jumbo is being arrested on the sidewalk.  And the

8    second individual ran down the street and into the woods.

9    Q.   And where is the car that had been waiting on Turnberry?

10   A.   That has pulled down the street and away from the post

11   office.

12   Q.   What were you doing at this point in the operation?

13   A.   I think this is me actually coming through the woods

14   here.

15   Q.   With the flashlight?

16   A.   Yeah.  I can't -- I know that I came back through the

17   woods.  We were close by the collection box.  I came back and

18   was standing with the officers and Mr. Jumbo for a short

19   period of time.

20   Q.   After this video ended, what did you do for the rest of

21   the early morning hours of July 22nd?

22   A.   Shortly after this, I received a phone call from

23   Detective Amy Cupp, with Newport News Police, who was with us

24   that night, that a carjacking --

25            MR. MITCHELL:  Objection, Your Honor, hearsay --

M. Newman -- Direct Examination by Mr. Coleman

1    Detective Amy Cupp.

2              MR. COLEMAN:  I'll rephrase.

3              THE COURT:  Okay.

4              MR. COLEMAN:  If you could limit your testimony to

5    just the things that you directly --

6              THE WITNESS:  I went across the street to a private

7    citizen who had been carjacked by the second suspect.  I

8    waited with him and tried to calm him down and stayed with

9    him until a marked unit came to meet with him and take his

10   witness statement.

11             At that point, I was notified that the vehicle that

12   he had been riding in or had been carjacked was now

13   abandoned in a neighborhood further into Newport News.  And

14   I went to that site as I had the, the jacket with the Arrow

15   Key, and they were bringing a K-9 unit out to attempt to

16   track that individual who had run through those, abandoned

17   the vehicle and run through the woods.  They were attempting

18   to get his scent.

19   BY MR. COLEMAN:

20   Q.  Did you all ever find that third person?

21   A.  No.  We did not.

22   Q.  Were you involved at all in the chase of the defendant?

23   A.  I was not.

24             MR. COLEMAN:  No further questions.

25             THE COURT:  All right.  Thank you, Mr. Coleman.

M. Newman -- Cross-Examination by Mr. Mitchell

```
 1              All right.  Mr. Mitchell.

 2              MR. MITCHELL:  Thank you, Your Honor.

 3              One moment to confer with counsel?

 4              THE COURT:  Of course.

 5              (Brief pause in the proceedings)

 6              MR. COLEMAN:  Your Honor, we've agreed to put some

 7    exhibits on the screen for defense.  And so --

 8              THE COURT:  That's great.

 9              MR. COLEMAN:  -- he'll just ask to publish, and

10    we'll publish for him.

11              THE COURT:  Thank you.  I appreciate that.

12                          CROSS-EXAMINATION

13    BY MR. MITCHELL:

14    Q.  Good afternoon, Inspector.

15    A.  Good afternoon.

16    Q.  I want to direct your attention to Exhibit 2 that's been

17    introduced and admitted into evidence.  Do you recognize

18    that?

19    A.  Yes, sir.

20    Q.  And under direct testimony, you indicated that this was a

21    fair and accurate depiction of the area surrounding the post

22    office, correct?

23    A.  Correct.

24    Q.  Okay.  But what is the date and time for -- excuse me --

25    the date of this particular exhibit?
```

M. Newman -- Cross-Examination by Mr. Mitchell

1   A.   It's January 14, 2025.

2   Q.   Okay.  So in the winter, correct?

3   A.   Yes, sir.

4   Q.   And this offense allegedly occurred when?

5   A.   In July, sir.

6   Q.   So in the summer?

7   A.   Yes, sir.

8   Q.   Okay.

9        MR. MITCHELL:  We're asking if Government's Exhibit

10  3 could be published, Your Honor.

11       THE COURT:  It may.

12  BY MR. MITCHELL:

13  Q.   And is the same true of this particular photo that's been

14  introduced into evidence, Inspector -- that these photos were

15  from the winter and not the summer when this allegedly

16  happened?

17  A.   Yes, sir.

18  Q.   Okay.  And we saw an aerial view of the post office,

19  correct?

20  A.   Yes, sir.

21  Q.   And would it be a fair statement to say that the

22  building, the post office, sits behind a line of trees?

23  A.   Depending on what angle, sir.  You mean from Turnberry?

24  Q.   From Turnberry, yes, ma'am.

25  A.   Yes, there's like a line of trees that runs along

M. Newman -- Cross-Examination by Mr. Mitchell

1    Turnberry in front of the building.

2    Q.  And you would agree that in July, in the summer, those

3    trees are going to be fuller than they are in these photos?

4    A.  I mean, I can only see a few trees.  It would depend on

5    the type of tree.

6    Q.  Sure.

7         MR. MITCHELL:  Can we pull up Exhibit 38-A please

8    and publish?

9         (The video is played in open court.)

10   BY MR. MITCHELL:

11   Q.  Exhibit 38-A is the surveillance video.

12        MR. MITCHELL:  Stop it there please.  Thank you.

13   BY MR. MITCHELL:

14   Q.  So this is the very same street, correct, Turnberry?

15   A.  Yes.

16   Q.  And you would agree that the trees are fuller here?

17   A.  Yes.  Yes, sir.

18   Q.  Okay.  Thank you.

19        And, Inspector, so you recovered the jacket that was

20   identified as a sweatshirt, Government's Exhibit 7?

21   A.  Yes, sir.

22   Q.  Okay.  And your testimony was that there was an Arrow Key

23   inside of that?

24   A.  Yes.

25   Q.  Starting with the jacket, did you take any investigative

M. Newman -- Cross-Examination by Mr. Mitchell

1  action to have the jacket tested for the presence of DNA?

2  A.  I can't answer to that, sir.  That would not have been my

3  role.  I turned it over to the case inspector, who is

4  Inspector Moore.

5  Q.  Okay.  I'm sorry, I probably worded it poorly.  Did you

6  have it tested for the presence of DNA?

7  A.  No, sir.

8  Q.  And you and Inspector Moore were jointly running this

9  operation?

10 A.  No, sir.  I'm his supervisor at the time.  So it's his

11 operation.  He was -- it's his investigation.  I was the

12 supervisor that's there that night.  So I oversee the

13 operation, but I do not run the operation -- if that makes

14 sense.

15 Q.  Yes, ma'am.  And with respect to the Arrow Key that was

16 found, again, same question -- did you have that tested for

17 the presence of DNA?

18 A.  Not me personally, no, sir.

19 Q.  Okay.  And what about fingerprints?

20 A.  Not me, sir.  Not personally, no.

21 Q.  All right.

22     MR. MITCHELL:  Your Honor, may I have one moment?

23     THE COURT:  You may.

24     (Brief pause in the proceedings)

25     MR. MITCHELL:  No further questions, Your Honor.

K. Moore -- Direct Examination by Mr. Coleman

 1          Thank you, Inspector.

 2          THE COURT:  All right.  Thank you, Mr. Mitchell.

 3          Any redirect, Mr. Coleman?

 4          MR. COLEMAN:  No further questions, Your Honor.

 5          THE COURT:  This witness can be excused?

 6          MR. COLEMAN:  Yes, ma'am.

 7          THE COURT:  All right.  Ma'am, thank you for your

 8   testimony.  You're excused.  Please don't discuss it with

 9   anyone.  Have a good rest of your day.  Thank you.

10          All right, Mr. Coleman, who is next?

11          MR. COLEMAN:  Your Honor, the next witness would be

12   the case agent.

13          Do you want us to call him or -- I didn't know when

14   the Court wanted to take its afternoon break.

15          THE COURT:  Actually, I think we're good for our

16   afternoon break since we had a late lunch.

17          Does anybody need an afternoon break?  If so, raise

18   their hand.  There's no hands.  So we can have Inspector

19   Moore.

20          The United States calls Keith Moore, Your Honor.

21          KEITH MOORE, called by the Government, having been

22   first duly sworn or affirmed, is examined and testifies as

23   follows:

24                      DIRECT EXAMINATION

25   BY MR. COLEMAN:

K. Moore -- Direct Examination by Mr. Coleman

1   Q.   Good afternoon, sir.  Will you please tell us your name.

2   A.   U.S. Postal Inspector Keith Moore, K-E-I-T-H, M-O-O-R-E.

3   Q.   How are you employed?

4   A.   I'm a United States Postal Inspector.

5   Q.   And how long have you been doing that?

6   A.   Nineteen years and four months.

7   Q.   Where are you based geographically?

8   A.   Norfolk, Virginia.

9   Q.   Do you only investigate cases in Norfolk?

10  A.   No.

11  Q.   Where else do you work?

12  A.   Our area covers the Peninsula, up the Eastern Shore, out

13  to approximately the Emporia area going westbound, and to the

14  North Carolina line.

15  Q.   What kinds of cases do you specialize in investigating?

16  A.   Primarily mail theft and identity theft cases.

17  Q.   How far did you go in school?

18  A.   Graduate degree.

19  Q.   In July of 2024, who was your supervisor?

20  A.   Marydith Newman.

21  Q.   Did you -- in July 2024, was there an undercover

22  operation?

23  A.   Surveillance operation, yes.

24  Q.   Were you the primary agent responsible for that

25  operation?

K. Moore -- Direct Examination by Mr. Coleman

1   A.  Yes.

2   Q.  I would like to show you what's previously been admitted

3   as Government's Exhibit 1.  Do you recognize this map?

4   A.  Yes.  I do.

5   Q.  What does it show?

6   A.  The post office at 685 Turnberry, which we referred to as

7   the Patrick Henry Post Office.

8   Q.  Where were you in the early morning hours of July 22,

9   2024?

10  A.  I was located inside of the Patrick Henry Post Office.

11  Q.  Where is that on this particular map?

12  A.  Essentially where the red dot is, that's the building.

13  And I would have been on the, I guess, southern part of that

14  building, facing the collection box.

15  Q.  What were you doing in the post office?

16  A.  I was what we call had eyes on the box so that I could

17  communicate with other law enforcement officers if the box

18  was breached.

19  Q.  And I'll show you what was previously admitted as

20  Government's Exhibit 2.  Do you recognize this location?

21  A.  Yes.  I do.

22  Q.  And is this -- how did this compare to the point of view

23  you had from the post office?

24  A.  Very close.  I was somewhat further back, I would say

25  another, estimating, maybe 40 feet back from where this

K. Moore -- Direct Examination by Mr. Coleman

1  picture was taken inside the building.

2  Q.  In anticipation of this operation, did you use any

3  technology to aid in your operation?

4  A.  Yes.  We did.

5  Q.  What was that?

6  A.  We had a sensor on the box door that would alert on our

7  cell phones when the door was opened, as well as surveillance

8  cameras to capture any video of vehicles pulling up to the

9  box.

10  Q.  In the early morning hours of July 22nd, did the

11  surveillance camera trigger?

12  A.  The surveillance camera did not trigger, no.

13  Q.  Why not?

14  A.  Because the surveillance camera was activated primarily

15  by a vehicle only, not by foot traffic.

16  Q.  Was anyone with you in the post office as part of the

17  operation?

18  A.  No.

19  Q.  What did you do -- well, first -- at some point in the

20  early morning hours of July 22nd, did something significant

21  happen?

22  A.  Yes.

23  Q.  What was that?

24  A.  I witnessed two individuals approaching the box, opening

25  the box, and accessing the contents of the blue collection

K. Moore -- Direct Examination by Mr. Coleman

1   box.

2   Q.  And what did you do at that time?

3   A.  I radioed to the other law enforcement officers to move

4   into the area because the box had been breached.

5   Q.  Did you immediately leave the post office?

6   A.  No.  I did not.

7   Q.  What did you do?

8   A.  I waited for the vehicle, the law enforcement officers

9   and vehicles to arrive before I exited the building.

10  Q.  Why was that?

11  A.  For my safety.  Since I was by myself, I did not want to

12  confront the two individuals on my own without having backup

13  right there.

14  Q.  Did you all consider having law enforcement officers

15  closer to the box where they could see everything?

16  A.  No.

17  Q.  Why not?

18  A.  Based on the layout of the area, there was not an open

19  area close enough to the box that you could covertly park

20  that would not stand out.

21  Q.  Let's go back to Government's Exhibit 1 briefly.

22          What is across the street from the Patrick Henry

23  Post Office?

24  A.  It's a wooded area.

25  Q.  Is that what you mean when you say there's limited area?

K. Moore -- Direct Examination by Mr. Coleman

1   A.  Yes.  For you to have actual eyes on that box, there was

2   no place to park a vehicle without basically standing out,

3   showing where your vehicle was at that point.

4   Q.  After you exited the post office, could you hear

5   anything?

6   A.  Yes.

7   Q.  What did you hear?

8   A.  I heard sirens and some voices.

9   Q.  What were the -- well, what did you see after you exited

10  the post office?

11  A.  So as I approached the box, I saw our vehicles converge

12  on the area.  I did see the two individuals take off running.

13          And at that point, I was, since I am opposite where

14  they would have been coming, I was trying to assess a safe

15  point where we would not have any type of crossfire if that

16  were to happen.

17  Q.  Was one of the suspects arrested that evening?

18  A.  Yes.

19  Q.  Where was he arrested?

20  A.  On the sidewalk on Turnberry.  When I emerged from the

21  collection box, around the corner, Inspectors Horne and Grant

22  had that particular suspect on the ground and were cuffing

23  him.

24          MR. COLEMAN:  Your Honor, I would like to read

25  Stipulation Number 5.

K. Moore -- Direct Examination by Mr. Coleman

```
 1            THE COURT:  Yes.

 2            MR. COLEMAN:  Stipulation Number 5 -- Government's

 3   Exhibit 7 is a true and accurate photograph of physical

 4   evidence -- excuse me.  I'm sorry.

 5            (Brief pause in the proceedings)

 6   BY MR. COLEMAN:

 7   Q.  Will you flip to Government's Exhibit 5 in that book.

 8            THE COURT:  So strike that?

 9            MR. COLEMAN:  Yes, Your Honor.

10            THE COURT:  Okay.

11            THE WITNESS:  Okay.

12   BY MR. COLEMAN:

13   Q.  Do you recognize this image?

14   A.  Yes.  I do.

15   Q.  What is it?

16   A.  It's an image of Sampson Jumbo in cuffs on the sidewalk

17   on Turnberry.

18   Q.  What else does this image show?

19   A.  There's a black backpack.

20   Q.  Is this a true and accurate depiction of that area as you

21   saw it that evening?

22   A.  Yes.  It is.

23            MR. COLEMAN:  Your Honor, the United States moves

24   to admit Government's Exhibit 5.

25            THE COURT:  It will be admitted.  And it can be
```

K. Moore -- Direct Examination by Mr. Coleman

1    published.

2              (Government's Exhibit 5 is admitted.)

3    BY MR. COLEMAN:

4    Q.  Will you flip to Government's Exhibit 29 please.  Do you

5    recognize that?

6    A.  Yes.

7    Q.  Who is that?

8    A.  Sampson Jumbo.

9    Q.  Is that a true and accurate depiction of Mr. Jumbo as you

10   know him?

11   A.  Yes.

12             MR. COLEMAN:  Your Honor, we would move to admit

13   Government's Exhibit 29.

14             THE COURT:  It will be admitted.  And it can be

15   published.

16             (Government's Exhibit 29 is admitted.)

17   BY MR. COLEMAN:

18   Q.  So who, again, is Mr. Jumbo and how does he relate to

19   this operation?

20   A.  He was one of the three people involved at the post

21   office collection box that night.  And he was apprehended on

22   the sidewalk.

23   Q.  If we could go back to Government's Exhibit 5, which was

24   just admitted.  Did you later search this backpack that's

25   pictured near Mr. Jumbo?

K. Moore -- Direct Examination by Mr. Coleman

1    A.  Yes.  I did.

2    Q.  What did you find in the backpack?

3    A.  Approximately 82 pieces of stolen mail.

4            MR. COLEMAN:  Your Honor, at this time, the United

5    States would move to read Stipulation Number 4.

6            THE COURT:  Yes.

7            MR. COLEMAN:  Ladies and gentlemen, Exhibits 6,

8    6-A, 8, 8-A, 20, 28, 30, and 31 are true and accurate

9    photographs of physical evidence that were taken by United

10   States Postal Inspector Moore.

11           The physical evidence was properly placed in

12   property evidence by Inspector Moore and properly stored and

13   maintained as evidence by the United States Postal

14   Inspection Service.  The parties agree that these exhibits

15   may be admitted without further evidentiary foundation.

16           Your Honor, at this time, the United States moves to

17   admit 6, 6-A, 8, 8-A, 20, 28, 30, and 31.

18           THE COURT:  They will be admitted.  And they can

19   all be published when you're ready.

20           (Government's Exhibits 6, 6-A, 8, 8-A, 20, 28, 30,

21   and 31 are admitted.)

22           MR. COLEMAN:  Your Honor, may we publish

23   Government's Exhibit 6.

24           THE COURT:  You may.

25   BY MR. COLEMAN:

K. Moore -- Direct Examination by Mr. Coleman

1    Q.   What is this image, Inspector Moore?

2    A.   That's the black backpack that was found with Sampson

3    Jumbo, as well as the contents of the stolen mail that was

4    inside the backpack.

5    Q.   What are the papers on the right?

6    A.   That's stolen mail.

7    Q.   How do you know that's stolen?

8    A.   We contacted some of the names that were on the mail who

9    stated that they --

10          MR. MITCHELL:  Objection to what they stated.

11   That's hearsay.

12          THE COURT:  Mr. Coleman?

13          MR. COLEMAN:  Yes, Your Honor.  We'll rephrase.

14          THE COURT:  Okay.

15          MR. COLEMAN:  Thank you.

16   BY MR. COLEMAN:

17   Q.   Where did you find the papers that were stacked on the

18   right?

19   A.   Inside of the backpack.

20   Q.   Did you later survey the papers that you see there on the

21   right?

22   A.   Yes.

23   Q.   Did you take pictures of it?

24   A.   Yes.

25          MR. COLEMAN:  I would like to publish Government's

K. Moore -- Direct Examination by Mr. Coleman

```
 1   Exhibit 6-A.
 2           THE COURT:  Yes.
 3           MR. COLEMAN:  Thank you, Your Honor.
 4   BY MR. COLEMAN:
 5   Q.  And do you recognize this image?
 6   A.  Yes.
 7   Q.  What does it show?
 8   A.  Some of the mail that was inside of the black backpack.
 9           MR. COLEMAN:  If we could turn to Page 2 please.
10   BY MR. COLEMAN:
11   Q.  What does this show?
12   A.  Additional mail that was found in the backpack.
13   Q.  Did you take these photographs?
14   A.  Yes.  I did.
15   Q.  Why?
16   A.  To document the mail that was in the backpack.
17           MR. COLEMAN:  Turn to Page 3 please.
18   BY MR. COLEMAN:
19   Q.  What does this show?
20   A.  Additional mail that was found in the black backpack.
21           MR. COLEMAN:  And if we could turn to Page 4.
22   BY MR. COLEMAN:
23   Q.  What does this show?
24   A.  Additional mail that was found in the black backpack.
25           MR. COLEMAN:  If there are any more pages, would
```

K. Moore -- Direct Examination by Mr. Coleman

1    you continue please.

2    BY MR. COLEMAN:

3    Q.  What does this show?

4    A.  Additional mail that was found in the black backpack.

5          MR. COLEMAN:  If you could turn to Page 6.

6    BY MR. COLEMAN:

7    Q.  What does this show?

8    A.  Additional mail that was found in the black backpack.

9          MR. COLEMAN:  If you could turn to Page 7.

10   BY MR. COLEMAN:

11   Q.  What does this show?

12   A.  A money order from Western Union.

13   Q.  And was this money order made payable to the defendant?

14   A.  No.

15   Q.  Or Mr. Jumbo?

16   A.  No.

17         MR. COLEMAN:  Continue if there are any more please.

18   BY MR. COLEMAN:

19   Q.  What did you do with this mail after you inventoried it?

20   A.  We released it back into the mail stream.

21   Q.  How many suspects were there in relation to your

22   surveillance operation in the early morning hours of July

23   22nd?

24   A.  Three.

25   Q.  Did you all ever locate the third suspect?

K. Moore -- Direct Examination by Mr. Coleman

1  A.  Negative.

2  Q.  Did you find any evidence in the area around the post

3  office box that evening?

4  A.  Yes.

5  Q.  What did you find?

6  A.  The box door open and mail was missing from the actual

7  tub inside.

8          MR. COLEMAN:  May I show the witness Government's

9  Exhibit 8 please?

10          THE COURT:  Yes.  And it can be published.

11  BY MR. COLEMAN:

12  Q.  Do you recognize this image?

13  A.  Yes.

14  Q.  What is it?

15  A.  It's a United States Postal Arrow Key.

16  Q.  Is this the Arrow Key that we just heard about in

17  relation to the sweatshirt?

18  A.  That's my understanding, yes.

19  Q.  And why is a postal Arrow Key significant for your

20  investigation?

21  A.  Because it is used to access the blue collection boxes

22  from individuals stealing mail.

23  Q.  Will you turn to Government's Exhibit 9 please.  Do you

24  recognize this image?

25  A.  Yes.  I do.

K. Moore -- Direct Examination by Mr. Coleman

1    Q.  What is it?

2    A.  It's an image of the interior of that blue collection box

3    after it was broken into.

4    Q.  Did you take that photograph?

5    A.  Yes.  I did.

6    Q.  Is that a true and accurate depiction of what the

7    interior of that box looked like that evening?

8    A.  Yes.  It is.

9            MR. COLEMAN:  Your Honor, the United States moves

10   to admit Government's Exhibit 9.

11           THE COURT:  It will be admitted.  And it can be

12   published.

13           MR. COLEMAN:  Thank you.

14           (Government's Exhibit 9 is admitted.)

15   BY MR. COLEMAN:

16   Q.  Can you explain to the jury what is pictured here?

17   A.  These are just some, what we call flats, like the

18   Priority Mail, and a couple of parcels that were mailed out.

19   And the white containers are what the post office calls tubs

20   that are located inside the blue collection box.

21   Q.  And did you all have anything in either one of these tubs

22   that you were attempting to use technology to aid in your

23   investigation?

24   A.  Yes.

25   Q.  What was that?

K. Moore -- Direct Examination by Mr. Coleman

1   A.  It was a GPS tracker located in a parcel.

2   Q.  Was that tracker taken that evening?

3   A.  No.  It was not.

4   Q.  So I would like to switch gears a bit.  Did you

5   investigate whether the defendant was under indictment at the

6   time of this mail theft in July of 2024?

7   A.  Yes.  I did.

8           MR. COLEMAN:  Your Honor, the United States would

9   like to read Stipulation Number 1.

10          THE COURT:  Yes.

11          MR. COLEMAN:  Ladies and gentlemen, Stipulation

12  Number 1 reads the Defendant, Jamal Ashton Shields, was

13  under indictment for a crime punishable by imprisonment for

14  a term exceeding one year during the months of June and July

15  2024.  He had previously appeared several times in Hampton

16  Circuit Court on the felony charges alleged to have occurred

17  on July 26, 2021, and, accordingly, he knew he was under

18  indictment during this time period.

19  BY MR. COLEMAN:

20  Q.  After the operation, did you later go back to the police

21  precinct in Newport News?

22  A.  Yes.  I did.

23  Q.  Did you receive any items of evidence from the Virginia

24  State Police?

25  A.  Yes.

K. Moore -- Direct Examination by Mr. Coleman

1  Q.  What was that?

2  A.  A firearm with a magazine -- which they had already

3  cleared.  When I say cleared, that means they had taken the

4  magazine and any rounds chambered out of the weapon to ensure

5  safety.

6  Q.  And I would like to show you Government's Exhibit 20

7  please -- which was previously admitted by stipulation.  Do

8  you recognize this image?

9  A.  Yes.  I do.

10  Q.  What is it?

11  A.  It's a picture of three cell phones, as well as a Glock

12  handgun, a holster, and a magazine full of rounds.  And

13  there's also one round which would have represented a

14  chambered round.

15          THE COURT:  You said 22, but it's really 20?

16          MR. COLEMAN:  Excuse me -- I meant to say

17  Government's Exhibit 20.  If I misspoke, I'm sorry.

18          THE COURT:  Got you.

19  BY MR. COLEMAN:

20  Q.  Are these the items of evidence you referenced that you

21  received from the Virginia State Police?

22  A.  That's correct.

23          MR. COLEMAN:  May I please show the witness

24  Government's Exhibit 24, which was previously admitted by

25  stipulation?

K. Moore -- Direct Examination by Mr. Coleman

```
 1              THE COURT:  Yes.
 2   BY MR. COLEMAN:
 3   Q.  Will you flip to Government's Exhibit 24 please.
 4   A.  Yes.  I'm there.
 5   Q.  Do you recognize this image?
 6   A.  Yes.  I do.
 7   Q.  What is it?
 8   A.  It's an ATF form that is used when someone purchases a
 9   firearm.
10              MR. COLEMAN:  Sorry -- one moment, Your Honor.
11              (Brief pause in the proceedings)
12              MR. COLEMAN:  I apologize -- I had the exhibit
13   number wrong.
14              Would you turn to Government's Exhibit 28 please.
15              THE COURT:  We're not talking about 24?
16              MR. COLEMAN:  That's right, Your Honor.  I
17   apologize.  It was previously admitted by stipulation.
18              THE COURT:  What's the new number?
19              MR. COLEMAN:  It's 28, Your Honor.
20              THE COURT:  Okay.
21   BY MR. COLEMAN:
22   Q.  Do you recognize this image?
23   A.  Yes.  I do.
24   Q.  What is it?
25   A.  It is our evidence bag containing the holster, as well as
```

K. Moore -- Direct Examination by Mr. Coleman

1    the chambered round, as well as magazine rounds in it.

2            MR. COLEMAN:  And I would like to show the witness

3    Government's Exhibit 30, which was previously admitted by

4    stipulation.

5            THE COURT:  All right.

6    BY MR. COLEMAN:

7    Q.  What does this show?

8    A.  That is our evidence bag containing -- I think that is

9    the backpack, the black backpack containing mail.

10            MR. COLEMAN:  And then may we please turn to

11    Government's Exhibit 31, which was previously admitted by

12    stipulation.

13            THE COURT:  It can be published.

14    BY MR. COLEMAN:

15    Q.  What does this show, Inspector Moore?

16    A.  That's the Glock 27 that was found in the vehicle with

17    the defendant.

18    Q.  As part your investigation of Mr. Shields, did you locate

19    that he had a public social media account?

20    A.  Yes.  I did.

21    Q.  And what social media service was that on?

22    A.  Facebook.

23    Q.  I would like to show you Government's Exhibit 35 --

24    excuse me.  Can you turn to that in the book please?

25    A.  Yes.

K. Moore -- Direct Examination by Mr. Coleman

1  Q.  Do you recognize this image?

2  A.  Yes.  I do.

3  Q.  What is it?

4  A.  It's a Facebook profile for the defendant.

5  Q.  What was the -- what was the user name for that profile?

6  A.  Blurp, AllmoneyinNomoneyout.

7  Q.  How do you associate this profile with the defendant?

8  A.  In reading a previous report from a different

9  jurisdiction, it was referenced as the --

10      MR. MITCHELL:  Objection.  Objection to the

11  contents of the previous report from the jurisdiction.  It's

12  hearsay.

13      MR. COLEMAN:  I'll rephrase, Your Honor.

14      THE COURT:  Okay.  And then, Mr. Mitchell, when

15  you're making your objections, your voice is fading out, so

16  if you could just bend down a little bit closer to --

17      MR. MITCHELL:  My apologies, Your Honor.

18      THE COURT:  No, you're fine.

19      All right, Mr. Coleman.

20  BY MR. COLEMAN:

21  Q.  Inspector Moore, did you review images and videos on this

22  particular post?

23  A.  Yes.  I did.

24  Q.  Did you recognize who was pictured in those images and

25  videos?

K. Moore -- Direct Examination by Mr. Coleman

1    A.  Yes.  I did.

2    Q.  Who was that?

3    A.  The defendant.

4    Q.  How did you recognize the defendant?

5    A.  Based on meeting him the night of the surveillance

6    operation and seeing the picture that matched his face.

7    Q.  And looking at the profile pictured in Government's

8    Exhibit 35, is that the same profile that you just

9    referenced?

10   A.  Yes.  It is.

11           MR. COLEMAN:  Your Honor, at this time, the United

12   States would move to admit Government's Exhibit 35.

13           THE COURT:  It will be admitted.  It can be

14   published.

15           (Government's Exhibit 35 is admitted.)

16   BY MR. COLEMAN:

17   Q.  Inspector Moore, what is this?

18   A.  This is the Facebook profile of the defendant.

19   Q.  Inspector Moore, do you see Mr. Shields in the courtroom

20   today?

21   A.  Yes.

22   Q.  Can you please identify him for the members of the jury?

23   A.  He's seated at the defense table, wearing a black vest

24   and white shirt and glasses.

25           MR. COLEMAN:  Your Honor, we ask that the record

K. Moore -- Cross-Examination by Mr. Mitchell

1   reflect that the witness has identified the defendant.

2           THE COURT:  The record will so reflect.

3           MR. COLEMAN:  One moment, Your Honor?

4           THE COURT:  Yes.

5           (Brief pause in the proceedings)

6           MR. COLEMAN:  No further questions, Your Honor.

7           THE COURT:  All right.  Thank you, Mr. Coleman.

8           Mr. Mitchell.

9           MR. MITCHELL:  Your Honor, may I have one moment to

10  confer?

11          THE COURT:  You may.

12          (Brief pause in the proceedings)

13          MR. MITCHELL:  Thank you, Your Honor.

14          THE COURT:  You're welcome.

15                         CROSS-EXAMINATION

16  BY MR. MITCHELL:

17  Q.  Inspector Moore, good afternoon.

18  A.  Good afternoon.

19  Q.  So the testimony that's been introduced so far has

20  identified you as the primary investigator, is that correct?

21  A.  Correct.

22  Q.  And you worked alongside Marydith Newman in planning this

23  operation?

24  A.  She was my boss, so I had to get clearance for the safety

25  protocols that we deployed for the operation.

K. Moore -- Cross-Examination by Mr. Mitchell

1    Q.  Does she also have any decisionmaking, any sway in the

2    decisionmaking process as far as your investigative steps?

3    A.  I mean if there was something that seemed unsafe, then,

4    yes, she would step in at that point.

5    Q.  Is it fair to say that during your 19 years of

6    experience, 19 years and four months of experience, that you

7    sometimes execute search warrants?

8    A.  Correct.

9    Q.  And the location of the execution of these search

10   warrants, sometimes that's a suspect's home?

11   A.  Sometimes, yes.

12   Q.  During the course of your investigation, did you have

13   occasion to learn what Mr. Shields' home address was?

14   A.  Prior to the night?  No.

15   Q.  At any time during your investigation, did you learn what

16   his address was?

17   A.  Yes -- based on what he said, yes.

18   Q.  And did you apply for a search warrant to try to uncover

19   anything that would tie him to this alleged conspiracy in his

20   home?

21   A.  No.

22   Q.  There's been testimony about this postal Arrow Key.  Did

23   you ask to have this Arrow Key tested for the presence of

24   DNA?

25   A.  No.

K. Moore -- Cross-Examination by Mr. Mitchell

1  Q.  Fingerprints?

2  A.  No.

3  Q.  There's been testimony about the coat the Arrow Key was

4  found in, correct?

5  A.  Yes.

6  Q.  Did you have that item tested for the presence of DNA?

7  A.  No.

8  Q.  And there's been testimony about mail.  Did you have any

9  of the items of mail tested for the presence of DNA?

10  A.  No.

11  Q.  Fingerprints?

12  A.  No.

13          MR. MITCHELL:  Your Honor, may I have a moment?

14          THE COURT:  You may.

15          (Brief pause in the proceedings)

16          MR. MITCHELL:  Thank you, Your Honor.

17  BY MR. MITCHELL:

18  Q.  Inspector Moore, I would like to circle back to some of

19  my earlier questions about the search warrants.  Would you

20  please educate the jury as to what the purpose of a search

21  warrant is?

22  A.  A search warrant is something that is applied for with a

23  magistrate judge to obtain access to a location potentially,

24  a phone potentially, or someone's person to obtain additional

25  evidence in a case.

K. Moore -- Redirect Examination by Mr. Coleman

1    Q.  Thank you very much, sir.

2            MR. MITCHELL:  No further questions, Your Honor.

3            THE COURT:  Thank you, Mr. Mitchell.

4            Mr. Coleman, any redirect, sir?

5            MR. COLEMAN:  Very brief.

6                        REDIRECT EXAMINATION

7    BY MR. COLEMAN:

8    Q.  Inspector, why didn't you have those items tested?

9    A.  In this particular situation, it wasn't warranted based

10   on the time frame we had.

11   Q.  Can you explain that for me?

12   A.  So we have multiple investigations going on at the same

13   time.  And DNA can take over a year to obtain.  So we

14   generally only use that when it's absolutely necessary.

15   Q.  Why wasn't it necessary here?

16   A.  Because we already had three or two people identified in

17   the actual break-in of that collection box.

18   Q.  And how did you identify them?

19   A.  Once they were apprehended, they told us their name, and

20   we verified who they were.

21   Q.  One of them was identified at the very location where the

22   mail was stolen?

23   A.  Correct.

24   Q.  And where was the other one identified?

25   A.  In a vehicle that had fled the scene on I64.

MICHELLE M. MAAR, Official Court Reporter

K. Moore -- Recross-Examination by Mr. Mitchell

1   Q.  Was there any doubt about whose items these belonged to?

2           MR. MITCHELL:  Objection, Your Honor.

3           MR. COLEMAN:  I don't think that's leading, Your

4   Honor.

5           THE COURT:  Overruled.

6           You can answer it.

7           THE WITNESS:  Rephrase or restate it please.

8   BY MR. COLEMAN:

9   Q.  Was there any doubt at that point in the investigation

10  whose items these belonged to?

11  A.  No.

12          MR. COLEMAN:  No further questions.

13          THE COURT:  Any re-cross on that, Mr. Mitchell?

14          MR. MITCHELL:  Yes, Your Honor.

15                          RECROSS-EXAMINATION

16  BY MR. MITCHELL:

17  Q.  Inspector Moore, isn't it possible that more than one

18  person could have touched the Arrow Key?

19  A.  Absolutely.

20  Q.  And your investigation was of three suspects?

21  A.  Correct.

22  Q.  And, lastly, did I understand your answer correctly -- it

23  would have taken too long to do those other things?

24  A.  For DNA it takes a very long time.

25  Q.  Thank you.

J. Galbreath -- Direct Examination by Ms. O'Brien

```
 1              MR. MITCHELL:  Thank you, Your Honor.

 2              THE COURT:  All right.  Thank you, Mr. Mitchell.

 3              Any further redirect?

 4              MR. COLEMAN:  No, Your Honor.

 5              THE COURT:  All right.  He can be excused back to

 6    the table?

 7              MR. COLEMAN:  For now.  He's the agent that we may

 8    recall --

 9              THE COURT:  Subject to recall.

10              MR. COLEMAN:  Yes, Your Honor.

11              THE COURT:  All right.  Inspector Moore, please

12    don't discuss your testimony with anyone -- even though

13    you're the case agent.

14              All right.  Who is next, Mr. Coleman?

15              MS. O'BRIEN:  Your Honor, the United States calls

16    Special Agent John Galbreath.

17              THE COURT:  All right.

18              JOHN GALBREATH, called by the Government, having

19    been first duly sworn or affirmed, is examined and testifies

20    as follows:

21                        DIRECT EXAMINATION

22    BY MS. O'BRIEN:

23    Q.  Agent Galbreath, good afternoon.  Can you please state

24    your name.

25    A.  Yes.  Good afternoon, Your Honor.  My name is Special
```

J. Galbreath -- Direct Examination by Ms. O'Brien

1    Agent John H. Galbreath.

2    Q.  Sir, what is your occupation?

3    A.  I am a Criminal Investigator for the Virginia State

4    Police.

5    Q.  And how long have you been with the Virginia State

6    Police?

7    A.  Since 2007.

8    Q.  So is that approximately 18 years?

9    A.  Yes, ma'am.

10   Q.  How long have you been a special agent with the Virginia

11   State Police?

12   A.  Since approximately 2015, so coming up on the 10-year

13   time frame.

14   Q.  And as a special agent, what are your duties?

15   A.  I investigate -- my permanent focus is investigating

16   narcotics activity, surveillance, and criminal investigation.

17   Q.  So currently you're a special agent.  But what, if any,

18   other positions have you held with the Virginia State Police?

19   A.  I was a Road Trooper since 2007 until approximately 2015.

20   And I'm currently a Drug Enforcement Administration Task

21   Force Officer.

22   Q.  And what, if any, other law enforcement experience did

23   you have prior to joining the Virginia State Police?

24   A.  I worked in corrections for five years, special

25   management.

J. Galbreath -- Direct Examination by Ms. O'Brien

1    Q.  So then turning to July 21, 2024 into the early morning

2    hours of July 22, 2024, were you employed as a special agent

3    by the Virginia State Police?

4    A.  Yes.  I was.

5    Q.  At that same time, were you involved in a United States

6    Postal surveillance operation?

7    A.  Yes.  I was.

8    Q.  And what was your role in that operation?

9    A.  We were to conduct surveillance in partnership with the

10   postal service with reference to criminal postal activity.

11          MS. O'BRIEN:  Your Honor, if I may show the witness

12   Government's Exhibit 13, which has been previously admitted

13   by Stipulation 7?

14          THE COURT:  You may.

15   BY MR. COLEMAN:

16   Q.  Agent Galbreath, can you identify the post office here on

17   the map?

18   A.  Yes, ma'am.  It's indicated with the red dot there, 685

19   Turnberry Boulevard.

20   Q.  And then if you can describe for the jury -- so the

21   technology -- you're not able to draw on the screen -- but

22   can you describe for the jury where you were in relation to

23   the post office that night?

24   A.  I'll just simplify as best as possible -- if you look at

25   the Turnberry Boulevard entry right there, if you look

J. Galbreath -- Direct Examination by Ms. O'Brien

1    towards your right, you will see what appears to be a blue

2    dot.  Just to the right of that is the Langley Federal Credit

3    Union parking lot that connects to Turnberry and Jefferson

4    Avenue.

5    Q.  Okay.  Just to help orient the jury, you're talking about

6    the blue dot that's --

7    A.  Correct.  And if you'll go just up and to your left --

8    Q.  This -- there's that big building that has like a white

9    rooftop and then that black asphalt parking lot?

10   A.  It's going to be to the right of where your --

11   Q.  The cursor is?

12   A.  -- cursor is -- to the right, to the right, to the right

13   of that blue object and just up to that tree.

14   Q.  And that's where you were at during the surveillance

15   operation?

16   A.  Yes, ma'am.  I was stationed in my vehicle right there.

17   Q.  Was anybody else there with you?

18   A.  There were other agents spread throughout the parking

19   lot, across the street, and additionally in the parking lot

20   as well.

21   Q.  And across the street -- you're talking about that

22   parking lot that has the building with like the long rooftop

23   and then also in that corner there's like an orange-colored

24   building?

25   A.  Yes, ma'am.

J. Galbreath -- Direct Examination by Ms. O'Brien

1   Q.  Around what time did you arrive to the location that you

2   were at?

3   A.  Approximately 10:45, 11:00.

4   Q.  And that night, were you wearing any -- I guess what were

5   you wearing that night?

6   A.  I was in plain clothes.  However, I was outfitted in my

7   ballistic vest which states "Police" on it.

8   Q.  And what kind of vehicle were you in?

9   A.  A 2023 black Hyundai Sonata.

10  Q.  Was that vehicle marked or unmarked?

11  A.  It was unmarked.

12  Q.  And why was it unmarked?  Or why is it unmarked?

13  A.  My function is generally for covert and surveillance

14  operations.

15  Q.  So are Virginia State Police special agents, do they

16  normally drive unmarked or marked vehicles?

17  A.  We always drive unmarked vehicles.

18  Q.  Are those vehicles, do they have lights and sirens?  Or

19  do they not?

20  A.  Correct -- they're outfitted with sirens.  And there's an

21  LED light that we put inside the window.

22  Q.  And that night, how were you all communicating with each

23  other?

24  A.  Radio communication on a surveillance channel.

25  Q.  And so going back to your spot here in the parking lot,

J. Galbreath -- Direct Examination by Ms. O'Brien

1    what could you see from that vantage point?

2    A.  From the location where the cursor is right now, there's

3    a direct line of sight to the left, down there towards the

4    685 Turnberry Boulevard location.

5    Q.  Was it busy -- or what kind of activity was going on that

6    night in that area?

7    A.  There were very few, if any, cars that had come past that

8    night.

9    Q.  Around what time did things start to pick up?

10   A.  It was approximately 2:35.

11   Q.  And what did you see that indicated that things were

12   picking up?

13   A.  Being that I had the primary eyeball, I observed a

14   smaller, darker color SUV turn onto the Turnberry Boulevard

15   entrance right there and travel down towards the Turnberry

16   Boulevard location where the post office is to the four-way

17   intersection that's at the end there and execute a U-turn.

18   Q.  In addition to the vantage point that you just described

19   to that line of sight, did you have anything else that was

20   aiding your vision that night?

21   A.  I used binoculars.

22        MS. O'BRIEN:  If we can pull up 38-A, which was

23   previously admitted by stipulation.

24        Your Honor, may we publish?

25        THE COURT:  You may.

J. Galbreath -- Direct Examination by Ms. O'Brien

1                  (The video is played in open court.)

2     BY MS. O'BRIEN:

3     Q.  So prior to your testimony here today, did you come to

4     the United States Attorney's Office and review video footage

5     from that night?

6     A.  Yes.  I did.

7     Q.  And did you review traffic camera footage that was -- or

8     did you review traffic camera footage from that night?

9     A.  Yes, ma'am.  I did.

10    Q.  Agent Galbreath, did you see the vehicle depicted in this

11    exhibit that night?

12    A.  Yes, I did, ma'am.

13    Q.  And then what does the vehicle do that you saw that we

14    don't see here on the screen?

15    A.  The vehicle goes down to that four-way intersection and

16    makes a U-turn.

17                  MS. O'BRIEN:  I'm going to fast forward the video

18    to minute 2, the 15 second marker.

19    BY MS. O'BRIEN:

20    Q.  Agent Galbreath, can you explain to me -- at this point,

21    where are you?  Are you still in that parking lot?

22    A.  I'm still stationed at the credit union parking lot, yes,

23    ma'am.

24    Q.  And the vehicle that you saw come down the road and turn

25    back around, where is it right now in this video?

MICHELLE M. MAAR, Official Court Reporter

J. Galbreath -- Direct Examination by Ms. O'Brien

1   A.   Approaching the area --

2   Q.   Is it the vehicle that is --

3   A.   Pulled over to the right side there.

4   Q.   Okay.

5            MS. O'BRIEN:  Can we hit play.

6            (The video is played in open court.)

7   BY MS. O'BRIEN:

8   Q.   So that vehicle that you just identified, when it takes

9   off, where are you?

10  A.   I'm still at the credit union at this point, getting

11  ready to come out of the parking lot.

12  Q.   Did you call out anything over the radio when you saw

13  this vehicle take off?

14  A.   Just when I saw the vehicle take off, I called out the

15  vehicle was breaking containment, and other units were

16  closing in.

17           MS. O'BRIEN:  If we can go back to Exhibit 13.

18  And this is the second page of Exhibit 13.

19  BY MS. O'BRIEN:

20  Q.   Before we talk about what is here on the map -- when that

21  vehicle broke containment, what did you do?

22  A.   I was actually on the way towards the vehicle, so we were

23  oncoming at the same time.  I executed a U-turn in the middle

24  of the roadway, activated my sirens, and placed my LED light

25  in the windshield, activated my LED light, and fell in behind

J. Galbreath -- Direct Examination by Ms. O'Brien

1    the vehicle.

2    Q.   Was that vehicle ever out of your sight?

3    A.   Never.

4    Q.   What, if any, behavior did that vehicle exhibit while it

5    was traveling down the roadway?

6    A.   Just a high rate of speed.

7    Q.   Were the lights on or off?

8    A.   At the time, the lights were on as it was going up

9    Jefferson Avenue.

10   Q.   And did the lights ever go off?

11   A.   Once the vehicle entered Interstate 64 westbound at Fort

12   Eustis, the lights were cut off, and it continued at a high

13   rate of speed.

14   Q.   So approximately how long was this chase?

15   A.   Probably about, I would say maybe 3 miles to the Fort

16   Eustis unauthorized turnaround crossover.

17   Q.   Okay.  I'm going to try to ask you questions to orient

18   the jury to the map here.  Where is the post office right now

19   on this map?

20   A.   You still see the red pin, indicating 685 Turnberry

21   Boulevard.  The post office is right there.  If you come down

22   -- drag your cursor -- okay, if your cursor comes down --

23   that's going to come straight toward Jefferson Avenue, right

24   there, the corner of Langley Federal Credit Union, Turnberry

25   and Jefferson.  From that point, the vehicle goes left which

J. Galbreath -- Direct Examination by Ms. O'Brien

1  parallels Interstate 64.

2  Q.  And then -- so it turns left and goes down Jefferson.

3  Then what happens?

4  A.  Well, it turned right but --

5  Q.  I'm sorry --

6  A.  -- it was a left turn, yes, ma'am.

7          The vehicle is at a high rate of speed going up

8  Jefferson Avenue.  At one point, I observed several pieces of

9  mail being thrown out of the vehicle.  At that point, I got

10 on the radio and called my dispatch, switched radio channels

11 to my dispatch, and asked them to send a trooper to the

12 intersection of Woodbridge and Jefferson Avenue to retrieve

13 what appeared to be several pieces of mail.

14 Q.  And were you the only one chasing that vehicle that

15 night?

16 A.  There was another agent who fell in at the same time

17 behind Mr. Shields.

18 Q.  Were there lights and sirens on that vehicle --

19 A.  That agent had lights and sirens as well, yes, ma'am.

20 Q.  Did you have -- were you wearing a body camera that

21 night?

22 A.  No, ma'am.  We don't have body cameras.

23 Q.  We being who?

24 A.  Special agents of the state police.

25 Q.  What about the vehicles, are they equipped with any kind

J. Galbreath -- Direct Examination by Ms. O'Brien

1  of --

2  A.  Our covert vehicles are not equipped with vehicle

3  cameras.

4        MS. O'BRIEN:  Your Honor, I would ask if we could

5  read Stipulation 9 to the jury.

6        THE COURT:  Yes.  That's fine.

7        MS. O'BRIEN:  United States Exhibits 10 through

8  12-A consist of video excerpts obtained from the dash camera

9  in Trooper Fischer's Virginia State Police vehicle on July

10  22, 2024 responding to the scene of the defendant's arrest

11  on I64 in Newport News.  The parties agree that the video

12  excerpts comprising these exhibits are authentic and

13  accurately depict the information contained therein and may

14  be introduced and admitted without further evidentiary

15  foundation.

16        THE COURT:  All right.  They can be admitted and

17  then published.

18        (Government's Exhibits 10 through 12-A are

19  admitted.)

20        MS. O'BRIEN:  Can you pull up Exhibit 11.

21        THE COURT:  Which number is this?

22        MS. O'BRIEN:  11.

23        (The video is played in open court.)

24  BY MS. O'BRIEN:

25  Q.  Agent Galbreath, can you describe to us what we're seeing

J. Galbreath -- Direct Examination by Ms. O'Brien

1   here?

2   A.  Yes, ma'am.  At this point, Trooper Fischer has arrived

3   on scene by way of coming up Interstate 64 west and executing

4   a U-turn at the Jefferson split.  I called her, not her

5   directly, but I called and requested as many units as

6   possible at the time to respond to that location due to the

7   nature of the enforcement that was going on.

8           So at this point right now, I'm to the left, up

9   against the guardrail.  I'm there armed with my rifle,

10  department-issued rifle.  That's my vehicle right there in

11  the middle of Lane 1 and Lane 2, just over the dotted lines.

12  And to the right right there, where you see the cursor, that

13  is Special Agent Covil's vehicle.

14  Q.  And where is the vehicle that you chased in relation to

15  you all?

16  A.  The vehicle is actually in front of mine.  You can just

17  barely see -- if you look to the right of my vehicle, just

18  over the top right-hand corner of it, you'll see the vehicle

19  that was being operated by Mr. Shields.

20  Q.  How do you know it was operated by Mr. Shields?

21  A.  After we executed a felony traffic stop, Mr. Shields was

22  restrained at that location right there and identified.

23          MS. O'BRIEN:  Please hit play.

24          (The video is played in open court.)

25  BY MS. O'BRIEN:

J. Galbreath -- Direct Examination by Ms. O'Brien

1    Q.  Can you describe to us where you went in this video from

2    the time we just saw you until now?

3    A.  I disappeared out of the scene because we approached the

4    vehicle that Mr. Shields was operating.  I gave him verbal

5    commands to, in what we call a felony traffic stop, to place

6    his hands on the top of his shirt, to raise his shirt up, to

7    turn around in a circle to verify that he had no weapon on

8    his person or on his body at the time.

9         Once he spun around, I requested that he follow the

10   sound of my voice and back up slowly towards the sound of my

11   voice which, towards the end of this, he will end up behind

12   my vehicle.

13   Q.  And backing up just a little bit -- what, if anything,

14   did you hear about a firearm?

15   A.  I did hear --

16        MR. MITCHELL:  Objection, Your Honor.  Objection to

17   what the witness is going to testify unless it comes from a

18   party opponent because otherwise it's hearsay.

19        THE COURT:  Unless what?

20        MR. MITCHELL:  Unless it comes from my client

21   because otherwise it's hearsay.

22        THE COURT:  Okay.

23        MR. MITCHELL:  The question was what, if anything,

24   did he hear.  I want to make sure whatever is spoken is

25   admissible.

J. Galbreath -- Direct Examination by Ms. O'Brien

1          THE COURT:  And I don't know the answer -- so you

2     do.

3          MS. O'BRIEN:  Yes, Your Honor, it will be an

4     admission by his client, a statement by his client.

5          THE COURT:  Okay.  All right.  Overruled.

6     BY MS. O'BRIEN:

7     Q.  What did you hear about the firearm?

8     A.  Mr. Shields was advised not to pick up a firearm.

9     Q.  And did you take any DNA from Mr. Shields' vehicle that

10    night?

11    A.  No, ma'am, I did not.

12    Q.  And why not?

13    A.  Basically, we were, as you can tell, in the middle of the

14    interstate.  If you play the video, you'll see cars still

15    continuing to pass right by the scene of the incident --

16    which that creates a safety factor for us.

17          (Brief pause in the proceedings)

18    BY MS. O'BRIEN:

19    Q.  While we're waiting here -- why were you all stopped in

20    the middle of I64?

21    A.  During the pursuit, eventually Mr. Shields pulled his

22    vehicle to a slow roll.  And we basically stopped our

23    vehicles in accordance with the way he stopped his vehicle.

24    Q.  And then can you orient us to where everyone is at right

25    now?

J. Galbreath -- Direct Examination by Ms. O'Brien

1   A.   Again, I'm there on the left side.   Trooper Fischer is

2   directly behind my vehicle, and Special Agent Covil is to the

3   right.   Mr. Shields is directly in front of Trooper Fischer,

4   backing up to the commands and my voice.

5   Q.   And was the defendant cooperative that night?

6   A.   Yes, ma'am, he was.

7   Q.   And then what are we watching here now?

8   A.   Trooper Fischer is going to now take Mr. Shields into

9   custody.   And after doing so, she'll bring him back to her

10  vehicle.

11          MS. O'BRIEN:   Your Honor, we would ask if we can

12  read Stipulation 6 to the jury.

13          THE COURT:   Yes.

14          MS. O'BRIEN:   Thank you.

15          Exhibits 14, 15, and 16 are true and accurate

16  photographs of physical evidence.   They were taken by

17  Virginia State Police Agent John Galbreath.   The evidence

18  was given to United States Postal Inspector Moore and

19  thereafter placed in the United States Postal Inspection

20  Service Property and Evidence Section and properly stored

21  and maintained as evidence by the United States Postal

22  Inspection Service.   The parties agree that these exhibits

23  may be admitted without further evidentiary foundation.

24          Your Honor, we would move to admit Exhibits 14

25  through 16.

J. Galbreath -- Direct Examination by Ms. O'Brien

1            THE COURT:  They'll be admitted.  And you may

2    publish them when you're ready.

3            (Government's Exhibit 14, 15, and 16 are admitted.)

4            MS. O'BRIEN:  Yes, Your Honor.

5            Can you pull up Government's Exhibit 14.

6    BY MS. O'BRIEN:

7    Q.  Agent Galbreath, let's talk about what, if any, evidence

8    you collected that night.  What is Government's Exhibit 14

9    that you're looking at?

10   A.  This is a picture of the Glock firearm recovered out of

11   the vehicle.

12           MS. O'BRIEN:  Can you pull up Exhibit 15.

13   BY MS. O'BRIEN:

14   Q.  What are we looking at here in Government's Exhibit 15?

15   A.  This was the chambered round that was taken out of the

16   firearm.

17   Q.  Where was the firearm found in the vehicle?

18   A.  Located on the passenger seat.

19   Q.  And turning back to this exhibit here -- when you say a

20   chambered round, what does that mean?

21   A.  When I say a chambered round, that means the gun has been

22   loaded and cocked with a round in the chamber, ready to pull

23   the trigger and fire it.

24           MS. O'BRIEN:  Can you pull up 16.

25   BY MS. O'BRIEN:

J. Galbreath -- Cross-Examination by Mr. Mitchell

1  Q.  What are we looking at here in Government's Exhibit 16?

2  A.  These are the pieces of mail that the trooper that I

3  called on the radio, for the assistance that I called on the

4  radio, these are the pieces of mail that were recovered -- I

5  should say the money order and checks that were recovered

6  from the items that were thrown out the window during the

7  pursuit.

8          MS. O'BRIEN:  Your Honor, no further questions.

9          THE COURT:  All right.  Thank you.

10         Mr. Mitchell.

11         MR. MITCHELL:  Thank you, Your Honor.

12         THE COURT:  You're welcome.

13                         CROSS-EXAMINATION

14  BY MR. MITCHELL:

15  Q.  Special Agent Galbreath, good afternoon.

16  A.  Good afternoon, sir.

17  Q.  I believe your testimony was that when asked about the

18  firearm, the gun, your testimony was that he was advised not

19  to pick up the firearm?

20  A.  That is correct, sir.

21  Q.  Isn't it true that Mr. Shields was the one that alerted

22  you to the presence of a firearm in his car?

23  A.  He did not alert me.  Special Agent Covil was in closer

24  proximity to him.  He must have, obviously, alerted Special

25  Agent Covil, and Special Agent Covil alerted him do not pick

J. Galbreath -- Cross-Examination by Mr. Mitchell

1   up the gun.

2   Q.  I understand.  Now, there's been reference to this high

3   speed chase.  Your testimony is that the high speed chase

4   lasted 3 miles?

5   A.  Somewhere in that ballpark.

6   Q.  Approximately?

7   A.  Yes, sir -- between, obviously, Jefferson Avenue,

8   Turnberry, and getting on the interstate, 3 miles, 4 miles,

9   somewhere in that ballpark, sir.

10  Q.  And how long would you estimate that chase lasted since

11  it was at a high rate of speed and it was for 3 miles?

12  A.  It was every bit of -- this all probably occurred in

13  about five to eight minutes I would think, in that ballpark.

14  Q.  And, Special Agent Galbreath, isn't it true that the

15  chase came to a stop because Mr. Shields stopped his car?

16  A.  He did stop his car, that is correct.

17  Q.  So you did not have to employ any tactical maneuvers to

18  make him stop?

19  A.  No, sir.

20  Q.  No spike strips?

21  A.  No, sir.  We only had our emergency equipment activated.

22  Q.  Did you see Mr. Shields as he was exiting his car?

23  A.  I did.

24  Q.  Anything in his hands?

25  A.  No, sir.

J. Galbreath -- Cross-Examination by Mr. Mitchell

1  Q.  In fact, this gun that was retrieved from his car, you
2  never saw him holding that gun, did you?
3  A.  No.  I did not see him, no.
4       MR. MITCHELL:  Your Honor, may I have one moment to
5  confer?
6       THE COURT:  You may.
7       MR. MITCHELL:  Thank you.
8       (Brief pause in the proceedings)
9  BY MR. MITCHELL:
10 Q.  One last question, sir -- were you the person that
11 retrieved the gun from the car?
12 A.  I did take the gun.  It was in a dark-colored leather
13 holster.
14 Q.  Thank you, sir.
15      MR. MITCHELL:  No further questions, Your Honor.
16      THE COURT:  Ms. O'Brien?
17      MS. O'BRIEN:  No further questions.
18      THE COURT:  All right.  And this witness can be
19 released?
20      MS. O'BRIEN:  Yes, Your Honor.
21      THE COURT:  Sir, please don't discuss your
22 testimony with anyone.  Have a good rest of your week.
23      (The witness testimony concludes for the day at
24 4:58 p.m.)
25

1

2                          CERTIFICATE

3

4            This is to certify that the foregoing partial

5    transcript of witness testimony, taken at the judicial

6    session of the United States District Court, Eastern

7    District of Virginia, Newport News Courthouse, is a true and

8    accurate transcription of the proceedings taken by me in

9    machine shorthand and transcribed to the best of my ability

10   by computer.

11            This, the 24th day of February 2025.

12

13            /S/  MICHELLE MAAR

14            Michelle Maar, RDR, RMR, FCRR
              Official Court Reporter
15

16

17

18

19

20

21

22

23

24

25